**Sherry GASAWAY, Plaintiff,**

v.

**NORTHWESTERN MUTUAL LIFE INS. CO., an Oregon corporation, Defendant.**

Civ. No. 91–00501 HMF.

United States District Court, D. Hawaii.

May 18, 1993.

Dennis W. Potts, Honolulu, HI, for plaintiff.

William C. McCorriston, Richard B. Miller, K. Rae McCorkle, Henry E. Klingeman (argued), McCorriston, Miho & Miller, Honolulu, HI, for defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON COUNTERCLAIM FOR RESCISSION

FONG, District Judge.

### INTRODUCTION

On Monday, May 10, 1993, the court heard a motion by defendant Northwestern Mutual Life Insurance Company ("NML") for summary judgment on the remaining counts of the complaint, filed on March 2, 1993. Plaintiff Sherry Gasaway ("Gasaway") filed a memorandum in opposition on April 8, 1993. NML filed a reply on April 29, 1993.

### BACKGROUND

This case involves a dispute over an individual disability income insurance policy issued by NML. Gasaway filed suit against NML after NML denied disability benefits to her. NML brought a counterclaim for rescission of the policy based on misrepresentations.

Gasaway was under contract as an insurance agent for NML beginning in March 1989. In April 1989, she applied for an NML life insurance policy. Her application and

supporting medical records from her physician, Dr. Edwin Dierdoff, indicated that she was suffering from allergies, chronic fatigue and depression, and that she was taking the medication Sinequan. In addition, Gasaway underwent a medical examination as part of her application process, which revealed that she was also taking the medication Dyazide. NML apparently had Equifax investigate her finances, education, health, and employment record as well. NML issued the life insurance policy to Gasaway. In May 1989, and again in August 1989, NML received from the Medical Information Bureau information that Gasaway had been reported to have a nervous disorder (effective disorder, depression, anxiety, hysteria, or nervous exhaustion) as of November 1985.

In July 1989, Gasaway applied for a second life insurance policy with NML. That application contained no additional medical information. NML thereafter issued the second life insurance policy to Gasaway.

In December 1989, Gasaway applied for the individual disability income insurance policy that is now in dispute. After routine review and processing of her application and supporting documents, NML issued the policy to her.

As part of the application process, Gasaway had a paramedical examination and completed and signed a medical history questionnaire. She answered "no" to all questions relating to prior disabilities, conditions, or treatments, except that she acknowledged that she had a physical examination and tests in April 1989 (question 36C). According to Gasaway's opposition, NML also received medical records from Gasaway's gynecologist, Dr. Renwick, which revealed a prescription for Dyazide for premenstrual fluid retention. Plaintiff also alleges that on or about December 15, 1989, she had a urinalysis test that was positive for diuretics.

NML now challenges Gasaway's negative responses to six of the questions on her application, claiming that they were fraudulent. Specifically, NML contends that subsequent investigation revealed that, contrary to her questionnaire responses, (1) Gasaway was using medication on a regular basis (question 32), (2) she had been treated in the last ten years for mental, nervous, or psychiatric disorders (question 33B), (3) she had suffered from a disorder of the muscles, bones, back, or joints (question 33H), (4) she had used prescription drugs in excess of prescribed dosages (question 34C), (5) she has previously received disability payments (question 37), and (6) she failed to provide information about various diagnoses and treatments (question 43).

Gasaway submitted a request for disability benefits under the policy in July 1990. She indicated that her illness first appeared in February 1990, and that she ceased all work because of her disability on March 1, 1990. She stated that the nature of the illness was "mental and swollen glands—fever—memory loss, aching joints." Her physician, Dr. Ken Arakawa, later diagnosed her (on November 8, 1990) as suffering from fibrositis, with onset in April 1990. Fibrositis is a condition of diffuse muscle aches and pains associated with fatigue, and often secondary to a sleep disorder. The symptoms of fibrositis resemble those of chronic fatigue syndrome.

Because Gasaway's claim was made within the contestable period of the policy, NML conducted a routine, but more extensive, claim investigation, which revealed significant omissions and misrepresentations regarding her medical history on all *three* of her insurance applications. NML discovered the following additional information:

(1) Gasaway failed to report numerous visits to doctors and treatment for myalgia (muscle pain) and hypokalemia (deficiency of potassium in blood), generalized anxiety disorder, and depression (which was mentioned in her life insurance application, but not in the disability application).

(2) Probable abuse of prescription drugs Dyazide (a diuretic) and Sinequan (for depression) was occurring. Gasaway had obtained duplicate prescriptions from two different doctors and was apparently filling both of them near the time of her application. Also, the pharmacy had alerted one of her doctors that she was picking up excessive prescriptions of Dyazide; the doctor instructed the pharmacist to discontinue.

(3) Furthermore, there was a pharmacy alert out on Gasaway in 1985, when she had a prescription for tenuate (another diet drug). Her doctor recommended that she seek counseling, and narcotics investigations by the DOH and the Prosecuting Attorney had checked into her medical records. Gasaway obtained a prescription for a different diet pill (ionamin) in 1988. NML concludes that the history suggests the possibility that Gasaway suffers from an eating disorder.

(4) Gasaway saw a psychotherapist on three occasions in 1988.

(5) Gasaway suffered from depression, job related stress and discrimination while employed at Dean Witter in 1983, and received disability benefits for 2 years.

Gasaway contends that this information was provided in large part to NML with her December 1989 application. She claims that she submitted supplemental forms entitled "500M" (containing the above medical history) and "500F" (containing financial information). NML claims that it does not use these forms, that it never received either form with her application, and that no one at the company saw either form until they were disclosed by Gasaway in May 1991. Affidavits from Susan J. Cairns, a unit head in the application input/issue division of the western region of the new business department of NML, and Patricia Westphal, the standards compliance consultant and former underwriter for NML, attest to the fact that there is no indication in any NML files that these forms were ever received, and that these are not standard NML forms. Moreover, no reference is made to either form in the application itself.

Gasaway counters that she gave both of the forms, along with her application, to her administrative assistant Diane Kutsunai for forwarding to NML. See Gasaway Response to Interrogatory No. 11, PEX I. Kutsunai testified at her deposition that she did not receive the forms. Wendi McCord, from the Island Printing Center, testified at her deposition that she remembered copying a "500M" form with doctors' names on it for Gasaway in early December 1989.

On January 24, 1991, NML's disability benefits officer David Gosse sent Gasaway a letter indicating that NML believed there were material misrepresentations in her application and that rescission was appropriate. Gosse also gave Gasaway a "reasonable period" to clarify or supplement her application. NML tendered a return of Gasaway's premium check in March 1991, but she refused to accept it.

Gasaway filed a complaint against NML in September 1991; NML counterclaimed for rescission of the policy. In May 1992, the parties stipulated to dismiss counts IV, V, and VI of the complaint. The remaining claims are for negligence (count I), breach of contract (count II), unjust enrichment (count III), and punitive damages (count VII), and the counterclaim for rescission.

## DISCUSSION

NML seeks summary judgment on the remaining counts of the complaint and its counterclaim. NML's argument focuses on whether it is entitled to rescind the individual disability policy due to Gasaway's alleged misrepresentations on her application. NML argues that Gasaway made material misrepresentations in her application that entitle NML to rescind the policy under Haw.Rev. Stat. § 431:10–209, which provides as follows:

A misrepresentation shall not prevent a recovery on the policy unless made with actual intent to deceive or unless it materially affects either the acceptance of the risk or the hazard assumed by the insurer.

In the alternative, NML seeks partial summary judgment that (1) Gasaway did make misrepresentations on her application for the disability policy, (2) those misrepresentations were material, and/or (3) there is no basis for a claim for punitive damages.

## I. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered when:

. . . the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any materi-

al fact and that the moving party is entitled to a judgment as a matter of law. The moving party has the initial burden of "identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). The movant need not advance affidavits or similar materials to negate the existence of an issue on which the opposing party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553.

If the moving party meets its burden, then the opposing party must come forward with "specific facts showing that there is a genuine issue for trial" in order to defeat the motion. Fed.R.Civ.P. 56(e); *T.W. Elec.*, 809 F.2d at 630. The opposing party cannot stand on the pleadings nor simply assert that it will discredit the movant's evidence at trial. *Id.* "If the factual context makes the [opposing] party's claim *implausible*, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *Cal. Arch. Bldg. Prods. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir.1987) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986)).

The standard for summary judgment reflects the standard governing a directed verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)). When there is a genuine issue of material fact, "the judge must assume the truth of the evidence set forth by the [opposing] party with respect to that fact." *T.W. Elec.*, 809 F.2d at 631. Inferences from the facts must be drawn in the light most favorable to the non-moving party. *Id.*

## II. *ANALYSIS*

### A. *Misrepresentations*

As stated above in the background section, NML claims that Gasaway misrepresented her medical history on six questions in her application for the disability policy, failing to disclose past medical problems, treatments, drug usage, and disability benefits. *See Sovereign Life Ins. Co. v. Rewald*, 601 F.Supp. 1489, 1493 (D.Haw.1985) (false statements on insurance application constitute misrepresentations under predecessor to Haw.Rev.Stat. § 431:10–209). Gasaway does not deny that her responses to these questions were false, except to contest the allegation that she abused prescription drugs; rather, she claims that a complete medical history was submitted to NML on the supplemental forms 500M and 500F, and that NML had previous knowledge of her medical history.

### 1. *Supplemental Forms*

The authenticity of the 500M and 500F forms remains a disputed issue. NML suggests that Gasaway fabricated these documents after NML tried to rescind her disability policy. Gasaway, however, has produced some evidence that the documents may have existed in December 1989. Assuming, then, that the documents did exist and that Gasaway did give them to her assistant, the question becomes whether NML can be charged with receipt of these forms.

NML submits that none of the employees that reviewed the file had ever heard of a 500M or 500F, or ever saw any indication of or reference to the supplemental forms. Westphal and Cairns Affidavits. Gasaway claims only that she gave them to her assistant, who does not recall them. Even if Gasaway did give the forms to her assistant, and her assistant failed to forward the forms with the application, the mistake of the assistant cannot be attributed to NML. Kutsunai was paid directly by Gasaway for the work she did for Gasaway, not by NML, and therefore was acting as an agent for Gasaway.[1] Gasaway has offered no evidence that the forms were ever mailed, or that NML ever received them.

### 2. *Previous Knowledge*

Gasaway argues that NML had knowledge of most of her medical history

---

1. Kutsunai also worked part-time as a receptionist for NML's office, but was paid separately for her work. In 1990, after Gasaway was terminated, Kutsunai was hired by NML full-time.

from her two prior life insurance applications and their supporting documents and doctors' records (see background section). NML concedes that some of the information was available from those applications, but argues that it cannot be held responsible for conducting an in-depth investigation into the truth of an applicant's statements before issuing a policy. *See Genovia v. Jackson National Life Ins. Co.*, 795 F.Supp. 1036, 1044 (D.Haw.1992) (cannot penalize insurer for failing to detect fraud at the outset). The fact that NML had the capacity to discover the truth on its own does not cure the misrepresentations made on Gasaway's application. Moreover, NML has demonstrated that it had discovered additional information in its claim investigation beyond the evidence it may have had access to before (see background section).

Accordingly, the court finds that Gasaway has failed to bring forth sufficient evidence to establish a genuine question of fact regarding the veracity of her application. Therefore, the court finds that misrepresentations were made regarding her use of prescription drugs, her history of treatment for mental or muscle disorders of the muscles, her previous disability benefits, and her complete history of diagnoses and treatments.

### B. *Materiality*

 Before NML is entitled to rescind the policy, however, it must establish that the misrepresentations were material—i.e., that the information would have materially affected either the acceptance of the risk or the

hazard assumed. Haw.Rev.Stat. § 431:10–209. In other words, if the misrepresentations relate to NML's decision to insure the risk, or if disclosure would have influenced the rate of premiums, then they are material. *Genovia*, 795 F.Supp. at 1041. *See also Sovereign Life v. Rewald*, 601 F.Supp. at 1494 (misrepresentations in life insurance application about net worth, business history of insured materially affected risk, even though not related to life expectancy).

NML contends that it would not have issued the disability policy if it had known of Gasaway's complete medical history. NML has submitted the affidavit of Patricia Westphal to establish that Gasaway's medical history was material to the risk being assumed by NML, and is "prepared to produce other NML underwriters" who concur.[2] Specifically, she concludes that, based on her extensive experience in underwriting, if Gasaway had disclosed the following information, NML would not have issued the policy:

1) she had suffered from and been treated for job related stress and Generalized Anxiety Disorder; 2) she had suffered from myalgia and hypokalemia; 3) she had received payments due, in part, to job related stress; 4) she was taking prescription medication in excess of recommended dosages; and 5) she had seen other physicians and health care providers for various conditions and ailments.

Westphal Affidavit ¶ 14. NML apparently does not have written guidelines that specifically address the consequences of this kind of information, but instead allows its underwrit-

---

**2.** Gasaway challenges the admissibility of the Westphal affidavit for the purposes of summary judgment. Fed.R.Civ.P. 56(e) requires that affidavits "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the Affiant is competent to testify to the matters stated therein." Gasaway argues it is inadmissible as evidence because 1) it refers to unnamed records, 2) there is no foundation for the conclusion that NML would not have issued the policy if it had known the full extent of her history, 3) no reference is made to a written policy governing underwriting considerations—i.e., because it is self-serving speculation.

NML responds with a supplemental affidavit from Westphal detailing her experience in insurance underwriting and listing the specific rec-

ords and facts upon which she relied in reaching her conclusions. She also analyzes additional information obtained since the filing of the motion. NML is offering Westphal as an expert in insurance underwriting, and the court would be inclined to qualify her as such. Moreover, the court finds that Westphal is competent to testify to these matters, and that her conclusions are based on her personal review of various medical, pharmaceutical, and government records. Expert testimony is admissible even if it is not based on first hand knowledge of the facts. Fed. R.Evid. 703; *Cabrales v. County of Los Angeles*, 864 F.2d 1454, 1460 (9th Cir.1988), *cert. granted and vacated*, 490 U.S. 1087, 109 S.Ct. 2425, 104 L.Ed.2d 982 (1989), *reinstated on remand*, 886 F.2d 235 (9th Cir.1989), *cert. denied*, 494 U.S. 1091, 110 S.Ct. 1838, 108 L.Ed.2d 966 (1990).

ers to use their own knowledge and experience in disability income insurance in arriving at their decisions.

The court recognizes that Westphal's conclusion that NML would not have issued the policy is speculative; other competent underwriters could disagree, especially since NML did not have a written policy regarding these types of risks. *Cf. Genovia,* 795 F.Supp. at 1041–42 (materiality of smoking history clear because insurance company had separate smoker's life insurance policy at higher premium); *Cohen v. Mutual Benefit Life Ins. Co.,* 638 F.Supp. 695 (E.D.N.Y.1986) (determination of materiality can be based on evidence of insurer's practice with similar risks and by testimony of qualified employee that insurer would not have issued policy if facts had been disclosed). But the decision of an individual underwriter is not the issue in this case. The relevant question is whether the misrepresented information was material to NML's decision to insure the risk.

Gasaway argues that NML already knew, or could have found out, her medical history from other sources, and therefore the nondisclosure of additional details would not have affected the decision to issue the policy. Although NML did have access to the records for her life insurance applications, the question is whether NML is required to do an extensive investigation to determine the truthfulness of an application.

This court held in *Genovia* that to require the insurer to detect fraud in the application would be to reward insurance fraud:

Plaintiff claims that '[m]any, if not most, of these alleged misrepresentations could easily have been put to rest at the very outset of the application process had the companies only bothered to spend the $7 or $10 for a urine-test.'

This argument is utterly fallacious. It essentially condones insurance fraud and argues that insurance companies should be penalized for failing to detect such fraud at the outset.

*Genovia,* 795 F.Supp. at 1044.

■ It is not clear from the evidence before the court whether anyone at NML looked at Gasaway's life insurance applications before issuing the disability policy. The court finds that NML can be charged with general knowledge of the information contained in its files. NML was on notice that Gasaway had been prescribed Dyazide and Sinequan, and that she suffered from chronic fatigue syndrome, depression, and had been reported to have an unspecified nervous disorder in 1985.

■ The court recognizes, however, that NML cannot be held to the burden of making inferential leaps to deduce that Gasaway may be abusing prescription medication, or to the requirement of conducting a detailed investigation into her medical history. The court will not find that NML is bound to its policy because it failed to scrutinize all the information it had about Gasaway to detect possible misrepresentations before issuing a policy. An insurer is entitled to rely on the representations of an insured in evaluating its risk, unless the application on its face cries out for further investigation. *See Genovia,* 795 F.Supp. at 1044; *Kraus v. Prudential Ins. Co. of America,* 799 F.2d 502, 504–05 (9th Cir. 1986) (under Oregon law, no duty to investigate application unless obviously incomplete on its face and omissions so obviously material that reliance would be reckless); *Schondorf v. SMA Life Ass. Co.,* 745 F.Supp. 866, 871 (E.D.N.Y.1990) ("duty rests with insured to furnish truthful, accurate and complete responses in order to allow the insurer to adequately evaluate any risks revealed"); *Vaughn v. American National Ins. Co.,* 543 P.2d 1404, 1406–07 (Okl.1975) (under Oklahoma statute, insurer does not have duty to investigate where revealed information in application did not alert to need to do so). To find otherwise would be to condone insurance fraud. The fact that NML had access to information about some of Gasaway's medical history that contradicted her application does not give Gasaway a license to lie.

Moreover, even if NML was careless in failing to detect discrepancies in her application, or if NML issued the disability policy after reviewing everything that was in its files, there was still additional information discovered from the claims investigation that was not previously submitted with any appli-

cation. NML discovered that Gasaway had received prior disability benefits for depression and job related stress, had duplicative prescriptions for Sinequan and Dyazide, suffered from myalgia and hypokalemia, and had been treated for generalized anxiety disorder. According to Westphal, all of these factors are relevant to the risk assumed by NML and were not included in the materials for her life insurance applications. These factors may even be causally connected to the symptoms of fibrositis, her diagnosed disability.[3]

Of course, if NML had received the 500M and 500F forms at the time Gasaway submitted her disability insurance application, then the misrepresentation would not be material because NML would have had the relevant information in its files. It does not appear that Gasaway has offered, or would be able to offer, sufficient evidence to raise a genuine issue of fact regarding the receipt of these forms. It is particularly suspect that Gasaway didn't bring them up until May 1991, especially in light of the letter from NML in January notifying her of its intent to rescind and giving her the opportunity to clarify her application. Therefore, the court finds that NML did not receive the forms and that the misrepresentations in Gasaway's application are material.[4]

### C. Rescission of Disability Policy

NML is entitled to rescind the policy under Haw.Rev.Stat. § 431:10–209 if it had established that the misrepresentations in Gasaway's disability insurance application materially affects either the acceptance of the risk or the hazard assumed by the insurer. Under Hawaii law, forfeiture of an insurance policy is strongly disfavored. *See Sovereign Life v. Rewald,* 601 F.Supp. at 1492. However, the public policy against insurance

fraud requires that an insurer be permitted to rescind a policy if the insured seriously breached a duty owed to the insurer, such as fraud. *See id.*

The court has found that Gasaway's application contained misrepresentations that were material to the risk assumed by NML in its decision to issue the policy. No genuine questions of material fact remain at this time regarding NML's right to rescind the policy. Therefore, the court GRANTS NML's motion for summary judgment with respect to its counterclaim for rescission and declares that NML is entitled to rescind the disability policy under Haw.Rev.Stat. § 431:10–209. NML is hereby ordered to return Gasaway's premiums to her in order to restore the benefit it gained from the policy. NML's counterclaim also seeks damages, attorney fees, and costs; the court will consider these requests upon a separate motion.

### D. Complaint and Punitive Damages

NML has also moved for summary judgment with respect to the remaining claims of Gasaway's complaint: negligence, breach of contract, unjust enrichment, and punitive damages. It appears that the court does not need to rule on these claims because rescission of the policy would dispose of plaintiff's claims against NML.

IT IS SO ORDERED.

---

**3.** Muscle pain (myalgia) and chronic fatigue syndrome, in particular, are related to fibrositis. Although Gasaway argues that fibrositis is different from her earlier disorders, she concedes her history of chronic fatigue syndrome put her at risk for the condition of fibrositis which ultimately caused her disability.

**4.** The facts of this case are distinguishable from the case plaintiff relies on, *AVEMCO Ins. Co. v. Chung,* 388 F.Supp. 142 (D.Haw.1975). In

*AVEMCO,* the court held that there was a genuine issue of fact concerning whether the failure of insured to have a valid medical certificate, which was a condition subsequent to the policy, had an impact on the insurer's risk, and therefore whether the misrepresentation caused prejudice to the insurer. Here, the court finds that the misrepresentations did make NML's risk more hazardous and that no genuine issues of fact have been raised by Gasaway.